## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 3:21-cr-0005** |
| ) | |
| **JEANORAH WILLIAMS,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**APPEARANCES:**

**DELIA SMITH, UNITED STATES ATTORNEY**
**EVERARD POTTER, ASSISTANT UNITED STATES ATTORNEY**
UNITED STATES ATTORNEY'S OFFICE
ST. THOMAS, U.S.V.I.
        *FOR THE UNITED STATES OF AMERICA,*

**MATTHEW CAMPBELL, FEDERAL PUBLIC DEFENDER**
**KIA D. SEARS, ASSISTANT FEDERAL PUBLIC DEFENDER**
OFFICE OF THE FEDERAL PUBLIC DEFENDER
ST. THOMAS, U.S.V.I.
        *FOR DEFENDANT JEANORAH WILLIAMS.*

## MEMORANDUM OPINION

**MOLLOY, Chief Judge.**

    **BEFORE THE COURT** is Defendant Jeanorah Williams' ("Williams") Motion to Supress Statement, ECF No. 43, and Motion to Suppress Physical Evidence, ECF No. 45, filed on April 19, 2021. The Court held an evidentiary hearing on April 22, 2022. After hearing testimony and the arguments of counsel, the Court took the matter under advisement. For the reasons stated below, the Court will grant the Motion to Suppress Statement, in part and deny, in part. The Court will deny Williams' Motion to Suppress Physical Evidence.

## I. FACTUAL BACKGROUND

    The relevant facts in this case that pertain to the motions Court are predominantly adduced from the testimony presented during the course of the April 22, 2022 evidentiary hearing. The Court heard testimony from three witness: United States Postal Inspection

Service ("USPIS") Special Agent Eric Oram ("Agent Oram"); Homeland Security Investigations ("HSI") Special Agent Brien Webber ("Agent Webber"); and Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent James Carter ("Agent Carter"). The Court also admitted nine exhibits into evidence, including: an Advice of Rights form, signed on December 8, 2020 (Exh. 3); an Advice of Rights form, signed on March 22, 2021 (Exh. 5); a handwritten consent to search form, signed on March 22, 2021 (Exh. 7); photographs of items recovered during the March 22, 2021 search (Exh. 8, 13, 16); a video recording of Williams' December 8th interview (Exh. 4.); and a video recording of Williams' March 22nd interview. (Exh. 6.) The Court took judicial notice of a tracking warrant and a search warrant, which it considered solely as proof that the search warrants from December 8, 2020 were issued and executed. Unless otherwise indicated, the testimony revealed the following facts.

### A. Events of December 8, 2020

Agent Oram testified that Williams initially came to his attention around March of 2020 after he received information regarding a gun and drug trafficking investigation. The investigation led to the discovery of post office boxes which were tied to Williams and co-Defendant Somalie Bruce ("Bruce").

On December 8, 2020, agents executed two search warrants; one at Bruce's residence in Estate Hannah's Rest, St. Croix, and the other at Williams' residence in Estate Richmond, St. Croix, respectively. At Williams' residence, agents searched a shed and shipping container on site. The search of the container produced multiple firearms and firearm parts. In her motion, Williams alleges that during the search she was subjected to an "extended detention at her home, which included questioning by agents." (ECF No. 43 at 2.) Agent Oram testified that upon conclusion of the search, Williams was detained and transported to the HSI office. Bruce was also detained during the search of his residence and transported to the HSI office.

Agent Oram testified that Williams arrived at the HSI office in the middle of the afternoon. He did not specify the time of Bruce's arrival. While at the HSI office, Bruce and Williams were held in separate holding cells. Williams was held in her cell alone. Agent Oram testified that he did not believe that Williams was handcuffed in the holding room and had access to water. Agent Oram questioned Bruce separately prior to Williams' interview.

After Bruce's interview was completed, Williams was brought into the interview room. The HSI interview room measured ten by ten feet and contained a circular table with three chairs. Once Williams was brought into the interview room, the agents informed of her *Miranda* rights, provided her with an advice of rights form, and asked her to initial each *Miranda* warning. Williams signed and initialed the Advice of Rights form at 7:58 p.m.

The Government introduced the recorded interview into evidence. *See* Exh. 4. However, the recording is muffled and difficult to understand. According to a timestamp viewable in the upper left corner of the video recording, agents began recording the interview at 8:37 p.m. *Id.* at timestamp 0:00. Agent Oram testified that the interview was calm and conversational, and that Williams did not express any hesitancy at any point.

Agent Oram further testified that he did not encourage Williams to sign the document, and instead only asked her if she was willing to talk about her story. The record reflects that during the interview, which was recorded, Williams admitted: (1) that she was aware of the firearm parts in her apartment; (2) that she knew Bruce made firearms in her apartment; and (3) that she picked up packages from the post office which she knew contained firearm parts. (ECF No. 53 at 5.) Williams further admitted that Bruce gave her cash to purchase money orders for the firearm parts, and that "[s]he saw Bruce leave with the firearm parts in a bag." *Id.* Williams left the interview room with the agents at 8:44 p.m. *See* Exh. 4 at timestamp 6:51. She was later released.

Prior to the interview, Agent Oram did not have any direct contact with Williams. Agent Oram was not present during the execution of the search warrant nor was he present when the agents transported Williams to the HSI office. Although he arrived at the HSI office shortly before Williams, Agent Oram's first contact with Williams occurred in the interview room. No other witnesses testified as to the events that took place on December 8, 2022.

### B. Events of March 22, 2021

The Government called Agent Webber as its second witness. Agent Webber testified that he first came into contact with Williams on March 22, 2021, while at her residence to

execute an arrest warrant.[1] Agent Webber testified that he and approximately three other agents approached the residence together and found Williams outside on her second-story balcony. The agents had weapons, which were holstered, and were not dressed in tactical gear. Weapons remained holstered throughout the encounter.

Agent Webber asked Williams to come down to the street level of her residence, which she did. The agents proceeded to have a quiet conversation with Williams on the street. During this conversation, the agents stated who they were and showed Williams their identification. The agents also informed Williams of additional parcels that had been shipped or recovered, which they suspected were located at the residence. Agent Webber informed Williams that these parcels were related to the search warrant previously executed on December 8, 2020.

Agent Webber testified that he then asked Williams for permission to search the residence for additional parcels, to which she verbally consented. Agent Webber testified that he did not have a formal consent form with him at that time because he had just completed another shift. As a result, Agent Webber handwrote a consent document, which reads: "3/22/2021 @ 830 AM[sic] [¶] I agree to allow DHS/ICE/HSI Agents to search the residence" followed by an address. (Exh 7.) Williams signed the document and Agent Webber witnessed the signing. *Id.*

After Williams signed the consent form, the agents entered the residence in small groups. Williams entered in front of the groups. While agents searched the residence, the door was left open and unlocked. Agent Webber testified that since Williams was cooperative, she was not placed in handcuffs and was able to roam freely without interference from the agents. He further testified that had Williams not been cooperative, she would not have been able to move freely during the search.

Agents recovered several items from the search including a black Nike toiletry bag, firearms tools, a money counter, money bands, plastic drug distribution capsules, firearm

---

[1] On March 18, 2021, a grand jury returned a nine-count indictment, of which four counts were against Williams. (ECF No. 1.) Arrest warrants were issued for both Williams and Bruce that day. (ECF Nos. 2-3.)

parts, and one round of ammunition. *See* Exhs. 13, 16. A machine gun conversion switch was found inside the toiletry bag. *See* Exh. 8.

Agent Webber testified that Williams did not express concerns about the search while it took place. After the search concluded, the agents placed Williams in handcuffs and notified her that she was under arrest. Agent Webber testified that Williams was placed under arrest at approximately 10:30 a.m. Several agents then transported Williams to the police station. It is not clear which agents transported Williams, however, Agent Webber was not present during the transportation.

The Government called Agent Carter as its third witness. Agent Carter testified that he first encountered Williams at the police station. Williams was brought into an interview room with Agent Carter and two additional agents at approximately 10:28 a.m.[2] Exh. 6 at timestamp 5:21. The agents then informed Williams of her *Miranda* rights and also provided her with a waiver form, which she initialed and signed at 10:41 a.m.[3] Agent Carter testified that no one encouraged or attempted to convince Williams to sign the form.

Once Williams waived her *Miranda* rights, Agent Carter proceeded with the interview. During the interview, Williams spoke freely. The Government avers that Williams made the following admissions:

> Williams denied owning the additional firearm parts found in her apartment which she shared with her codefendant, Bruce. She admitted Bruce resided with her and that no one else stored items in the apartment. She admitted to purchasing money orders and collecting packages containing firearm parts from the Post Office. She further admitted she visited the Hannah's Rest property with the Conex Box with firearms and firearms parts inside. Williams stated that to her knowledge, no one other than Bruce uses the Conex Box.

(ECF No. 53 at 5.)

Williams also stated during the interview that she thought that the agents had taken everything they needed while executing the initial search warrant. *See* Exh. 6 at timestamp

---

[2] The Court notes that Agent Webber testified that Williams was placed under arrest at her residence at approximately 10:28 a.m. However, the time indicated on the video states that the interview started around 10:28 a.m.

[3] The timestamp located in the top left corner of the video recording indicates that this took place at approximately 10:34 a.m. *See* Exh. 6 at timestamp 10:40. The Court does not find this discrepancy to be significant.

16:30. Williams expressed that she did not know that the agents needed to search for anything else, and that she was told that they were only looking for a package. *Id.* at timestamp 16:39. Agent Carter testified that the interview was calm and conversational. Williams did not show signs of distress during the interview, nor did she request that the interview be stopped at any time. After approximately 36 minutes, the interview concluded at 11:04 a.m. *Id.* at timestamp 40:46.

On April 19, 2021, Williams filed the instant motions to suppress statements and physical evidence. (ECF Nos. 43 and 45.) The Government filed its oppositions to the motions on May 3, 2021. (ECF Nos. 53 and 54.)

In her Motion to Suppress Statements, Williams seeks to suppress "any and all statements made during both interrogations," on the grounds that she was "unquestionably detained and interrogated" without receiving her *Miranda* warnings. (ECF No. 43 at 2.) Williams argues, specifically as to the December 8, 2020 encounter, that she was read her *Miranda* warnings "[a]fter an extended detention at her home, which included questioning by agents." *Id.* As to the March 22, 2021 encounter, Williams again argues that agents questioned her without advising her of her *Miranda* warnings. Williams further argues that to the extent that she did waive her *Miranda* rights, the waiver was not knowing and voluntary, and any such waiver came after "un-Mirandized" questioning in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004). *Id.* Williams alleges that, as a result, all statements from both the December 8, 2020 and March 22, 2021 encounters were in obtained in violation of her privilege against self-incrimination, right to counsel as guaranteed by the Fifth and Sixth[4] amendments, and her right to due process. *Id.* at 3.

In her Motion to Suppress Physical Evidence, Williams seeks to suppress all physical evidence obtained as a result of the March 22, 2021 search, on the grounds that the consent

---

[4] Although Williams asserted an argument under the Sixth Amendment, she made no argument to this effect outside of a passing mention in her motion. *See* ECF Nos. 43, 45. Therefore, the Court deems this argument waived. *See Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("As a threshold matter, an argument consisting of no more than a conclusory assertion such as the one made here (without even a citation to the record) will be deemed waived."); *Kantz v. Univ. of the V.I.*, No. 2008-0047, 2016 U.S. Dist. LEXIS 65973, at *81 (D.V.I. May 19, 2016) (quoting *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000)) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues.").

was invalid and, therefore, the seizure was in violation of the Fourth amendment. (ECF No. 45 at 2.)

## II. DISCUSSION

### A. *Colorable Constitutional Claim of Law*

The Court finds it necessary to first address a somewhat threshold issue raised by the Government. The Government first argues that Williams was not entitled to a hearing on her motions because she failed to assert a colorable claim that the Government violated her constitutional rights. The Government argues that Williams has not made any specific allegations in her motion of "deficiencies in the Miranda advisal, her ability to understand her rights, or any other defect which would render her statements inadmissible in the Government's case in chief." (ECF No. 53, at 9.) The Government similarly argues that Williams' motion to suppress physical evidence fails to allege misconduct or violation of law that would render the consent to search involuntary. (ECF No. 54, at 9.)

An evidentiary hearing on a motion to suppress is not granted as a matter of course. *See Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999) (finding that the decision whether to hold an evidentiary hearing "rests in the sound discretion of the district court"). In *United States v. Hines*, 628 F.3d 101 (3d Cir. 2010), the Third Circuit explained:

> Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure permits defendants to file "motions to suppress evidence" before trial, but evidentiary hearings on such motions are not granted as a matter of course. *See* Rule 12(c) (the court "may" schedule a motion hearing). To require a hearing, a suppression motion must raise "issues of fact material to the resolution of the defendant's constitutional claim." *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996). A motion to suppress requires an evidentiary hearing only if the motion is sufficiently specific, non-conjectural, and detailed to enable the court to conclude that (1) the defendant has presented a colorable constitutional claim, and (2) there are disputed issues of material fact that will affect the outcome of the motion to suppress. *See id.* at 1067 (stating a claim is "colorable" if it consists "of more than mere bald-faced allegations of misconduct"); [*United States v. Brink*, 39 F.3d 419, 424 (3d Cir. 1994)] (requiring an evidentiary hearing when a defendant states a colorable claim that the government obtained evidence by violating his constitutional rights). At bottom, the purpose of an evidentiary hearing in the context of a suppression motion is to assist the court in ruling upon a defendant's specific allegations of unconstitutional conduct—its purpose is not to assist the moving party in making discoveries that, once learned, might justify the motion after the fact. To require an evidentiary hearing, a defendant's

suppression motion therefore must set forth and identify for the court specific and concrete "issues of fact material to the resolution of the defendant's constitutional claim." *Voigt*, 89 F.3d at 1067.

*Id.* at 105.

> In Williams' motion to suppress statements, she makes the following allegations:
>
> Williams was taken into custody on December 8, 2020 when officers arrived at her home to execute a search warrant. After an extended detention at her home, which included questioning by agents . . . .
>
> ...
>
> On March 22, 2021, Ms. Williams was arrested at her home, taken to a holding facility, read her Miranda warnings and interrogated by various federal agents. Prior to her arrest, she was questioned in her home without having been advised of her Miranda warnings."

(ECF No. 43 at 2.)

In Williams' motion to suppress physical evidence, Williams alleges that agents employed "coercive tactics" such as "misrepresentations to Ms. Williams" regarding the nature of the search that render the consent invalid. (ECF No. 45 at 3.)

After the government responded to the suppression motions, the Court scheduling the matter for an evidentiary hearing. This alone should have put the Government on notice that it should be prepared to satisfy any burdens on the motions to suppress. Nonetheless, During the evidentiary hearing, the Court found that Williams had stated a colorable claim for relief, albeit by a razor-thin margin. Williams' allegations are sparsely detailed and minimally specific, but briefly describe actions that, if true, could call into question the voluntariness of the December 8 and March 22 statements, as well as the March 22 consent to search.

The Government reasserted the argument that Williams had failed to assert a colorable claim of law and that a hearing was unnecessary during the evidentiary hearing itself. The Government further appeared to assert that it was unable to adequately prepare for the hearing as a result of this alleged failure.

In so doing, the Government has failed to appreciate the procedural posture of the present matter. While a defendant is not entitled to a hearing, "whether to hold an

evidentiary hearing on the admissibility of contested evidence rests in the sound discretion of the Court." *Padillas*, 186 F.3d at 418 (3d Cir. 1999). The Court, in its discretion, scheduled a hearing on the instant motion on May 10, 2021. *See* ECF No. 57. The Government was put on notice from that date and was responsible for preparing for the hearing accordingly. To the extent that the Government relied on its argument disputing whether Williams had asserted a colorable claim, this is not an excuse for a lack of adequate preparation otherwise. The Court identified cognizable claims within the motion; the Government should have been able to do the same. Therefore, any failure to prepare is unexcused.

### B. Whether the Statements Made by Williams on December 8, 2021 Should be Suppressed

To safeguard an individual's Fifth Amendment privilege against self-incrimination, the Supreme Court has held that the government may not introduce statements made by an individual who is subject to "custodial interrogation" unless he first has been given his *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 445 (1966). The Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.*

Since *Miranda*, the Third Circuit has set forth a two-pronged test to facilitate the determination of whether there has been "custodial interrogation." First, a court must "determine whether the suspect was in 'custody.' . . . If the suspect was in 'custody,' the court then must decide whether the police interrogated him." *United States v. Mesa*, 638 F.2d 582, 585 (3d Cir. 1980) (citing *Orozco v. Texas*, 394 U.S. 324 (1969) and *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980)).

"An individual is in custody when he or she has been 'deprived of his [or her] freedom of action in any significant way.'" *United States v. Jacobs*, 431 F.3d 99, 104 (3d Cir. 2005) (alteration in original) (citations omitted). The Third Circuit has explained that there are at least three different tests for whether a person is in custody:

> (1) when the person has been deprived of her or his freedom in some significant way; (2) when a reasonable person would perceive that she or he was not at liberty to terminate the interrogation and leave; and (3) when there

> is a restraint on the person's freedom of movement of the degree associated with a formal arrest.

*Id.* at 105. "[T]he determination of custody is an objective inquiry (that is, what a reasonable person would believe) based on the circumstances of the interrogation." *Id.*

The other component for *Miranda* purposes is interrogation, which has been defined as any "express questioning or its functional equivalent." *Innis*, 446 U.S. at 300–301. This definition includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.*

Once a suspect has been Mirandized, the suspect must "unambiguously" invoke his right to remain silent or his right to counsel in order for those protections to attach. *See Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (holding that a suspect had to unambiguously invoke his right to silence in order for *Miranda* to require law enforcement to cease questioning); *Davis v. United States.*, 512 U.S. 452, 461 (1994) (requiring a suspect to unambiguously invoke his right to counsel). Simply remaining silent is insufficient to invoke the right to remain silent. *Berghuis*, 560 U.S. at 380-82. Ambiguous or equivocal statements are similarly insufficient to invoke one's *Miranda* rights. *Id.* at 381. Furthermore, refusing to sign a *Miranda* waiver alone is not an invocation of the right to remain silent. *See United States v. Plugh*, 648 F.3d 118, 125 (2d Cir. 2011) ("While his refusal to sign the form presented to him upon arrest may have unequivocally established that he did not wish to waive his rights *at that time,* his concurrent statements[—'I am not sure if I should be talking to you' and 'I don't know if I need a lawyer'—] made equally clear he was also not seeking to *invoke* his rights and thus cut off all further questioning at that point."); *United States v. Binion*, 570 F.3d 1034, 1041 (8th Cir. 2009) ("Refusing to sign a written waiver of the privilege against self-incrimination does not itself invoke that privilege and does not preclude a subsequent oral waiver.").

However, a suspect may waive these rights, "provided the waiver is made voluntarily, knowingly and intelligently." *United States v. Velasquez*, 885 F.2d 1076, 1084 (3d Cir. 1989) (quoting *Miranda,* 384 U.S. at 444.) The Court must engage in a two-step inquiry to determine whether a waiver was voluntary, knowing, and intelligent. First, the waiver must have been

"'the product of a free and deliberate choice rather than intimidation, coercion or deception.'" *Velasquez,* 885 F.2d at 1084 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Second, the waiver "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* The Third Circuit has further explained:

> [t]his inquiry requires us to consider the totality of the circumstances surrounding the interrogation, which includes examining the events that occurred and the background, experience, and conduct of the defendant. *Miranda* rights will be deemed waived only where the totality of the circumstances "reveal[s] both an uncoerced choice and the requisite level of comprehension."

*United States v. Sriyuth*, 98 F.3d 739, 749 (3d Cir. 1996) (quoting *Moran*, 475 U.S. at 421) (internal citations omitted).

Courts should also consider "the information known by the officer[s] concerning the suspect's culpability," as "'[t]he more cause for believing the suspect committed the crime, the greater tendency to bear down in interrogation and create the kind of atmosphere of significant restraint that triggers *Miranda*, and vice versa.'" *Jacobs*, 431 F.3d at105. (citing *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974)). Finally, courts should also take into account "whether the officer[s] revealed [their] belief that the suspect was guilty," as this factor may bear upon the custody issue if the officers convey such belief to the suspect "word or deed." *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 325 (1994)) (internal quotations omitted).

It is undisputed that officers subjected Williams to a custodial interrogation on December 8, 2020 while at the HSI office. Williams does not contest officers provided her with an Advice of Rights form. Further, the record shows that she was given the *Miranda* warnings and that she signed a form waiving her rights. *See* Exh. 4. However, Williams argues that waiver was not made "knowingly and voluntarily" and therefore was invalid. (ECF No. 43 at 2.) As to the December 8, 2020 search, Williams specifically alleges that she experienced an "extended detention at her home, which included questioning by agents. . . ." *Id.* At the evidentiary hearing, Williams emphasized that the Government provided no

evidence regarding the time leading up to the waiver, arguing that they had failed to meet their burden.

"As a general rule, the initial burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citing *United States v. Acosta*, 965 F.2d 1248, 1256 n.9 (3d Cir. 1992)). However, once a defendant challenges the admissibility of any statements made while in custody, "the burden shifts to the government." *Johnson*, 63 F.3d at 245. Specifically, the Government must prove by a preponderance of the evidence "that the defendant  was advised of and understood [his] *Miranda* rights and that he . . . validly waived those rights." *United States v. Hodge*, No. 2016-0009-03, 2017 U.S. Dist. LEXIS 26116, at *37-39 (D.V.I. Feb. 24, 2017) (alterations in the original) (quoting *United States v. Briscoe*, 69 F. Supp. 2d 738, 741 (D.V.I. 1999), *aff'd in part, rev'd in part on other grounds*, 234 F.3d 1266 (3d Cir. 2000)); *see also Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986). As the Court determined, *supra*, Williams has met her burden of challenging the admissibility of her statements. Therefore, the burden has shifted to the Government to prove, by a preponderance of the evidence, that the waiver was valid.

As previously stated, only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Id.* at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). Assessing whether a defendant has validly waived her rights is highly fact-specific, and no single criterion controls. *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009). Importantly, while a written waiver is "strong proof" of validity, "a writing is neither necessary nor sufficient to sustain the Government's burden of [proof] . . . ." *Burnett*, 2013 U.S. Dist. LEXIS 94493 at *15 (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). Furthermore, "[i]t is settled that at a hearing on a motion to suppress, 'the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.'" *United States v. Leveto*, 343 F.Supp.2d 434, 442 (W.D.Pa.2004) (quoting *United States v. McKneely*, 6 F.3d 1447, 1452-53 (10th Cir. 1993),

and citing *United States v. Matthews*, 32 F.3d 294, 298 (7th Cir. 1994)); *see also Government of the Virgin Islands v. Gereau*, 502 F.2d 914, 921 (3d Cir. 1974)).

There is a concerning lack of evidence from the December 8, 2020 encounter. Agent Oram testified as to direct knowledge of the signing of the *Miranda* waiver and the interview itself. However, Agent Oram was not present during the search, during the transport, and could not definitively describe the state in which Williams was detained while at the facility. Although Agent Oram testified as to the events leading up to interview, his testimony was not based on personal knowledge, and the Government failed to produce any witnesses that could corroborate his statements. Were the Court to credit his testimony as truth, it would be assuming the credibility of the unknown individual who provided Agent Oram with this information. The Court declines to make such assumptions. *See e.g. United States v. Ansah,* No. 1:17-CR-00381-1-WSD-JSA, 2018 U.S. Dist. LEXIS 117417, at *22-23 (N.D. Ga. June 12, 2018) ("[T]he Court has the discretion to  decline to give weight to evidence that lacks sufficient substance or foundation.)

As a result, there are several hours spanning from Williams' first encounter with officers to her initial encounter with Agent Oram during the interview, which are effectively unaccounted for, during which time Williams alleges she was detained for an "extended" time at her home "which included questioning by agents." (ECF No. 43 at 2.) Indeed, there are some circumstances known to the Court, such as the length and location of the interrogation and Williams' mental and physical state at the time, which appear to favor a finding of a valid *Miranda* waiver and voluntary confession. However, as previously stated, "the crucial element" of the inquiry is "police coercion." *Withrow*, 507 U.S. at 693.

The Court must evaluate whether a *Miranda* waiver was validly taken based on the totality of the evidence. The Government has failed to provide any credible evidence as to what occurred in the several hours leading up to Williams' waiver. In the absence of any such evidence, the court cannot conclude based on the totality of the evidence that the waiver was valid. Therefore, the Government has not met its burden of showing that that no coercive activity transpired. *Cf. Tague v. Louisiana,* 444 U.S. 469, 471 (1980) ("'[The] courts must presume that a defendant did not waive his rights; the prosecution's burden is great.' In this

case no evidence at all was introduced to prove that petitioner knowingly and intelligently waived his rights before making the inculpatory statement. The statement was therefore inadmissible.") (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)); *United States v. St. Rose*, 189 F. Supp. 3d 528, 546-47 (D.V.I. 2016) (finding that the Government had failed to meet its burden of proof  where they provided evidence that the interrogating officer had advised the defendant of his *Miranda* rights, but did not provide evidence as to whether the waiver was knowing and intelligent); *United States v. Sanchez-Manzanarez*, 2012 U.S. Dist. LEXIS 12757, at *23 (S.D.N.Y. Feb. 2, 2012) (finding insufficient evidence where a defendant waived his *Miranda* warnings using a Spanish interpreter but the interrogating agents, who did not speak Spanish, could not confirm whether an interpreter had adequately *Mirandized* the defendant); *United States v. Siler*, 526 F. App'x 573, 576 (6th Cir. 2013) (reversing the District Court's denial of a motion to suppress where the Government "failed to show by a preponderance of the evidence that the confession was voluntary").

Accordingly, the Court finds that the *Miranda* waiver taken on December 8, 2020, was invalid, and grants Williams' motion to suppress as to the December 8, 2020 statements.[5]

### C.  Whether the Statements Made by Williams on March 22, 2021 Should be Suppressed

#### 1.  Whether Williams was in Custody During the Search of her Residence

Williams asserts that she was "unquestionably detained and interrogated" during the search of March 22, 2021 without having been properly *Mirandized*. (ECF No. 43 at 2.) Therefore, Williams argues, any statements made during the search are inadmissible. Williams further argues that any *Miranda* waiver followed the un-*Mirandized* interrogation was invalid. *Id.* at 3.

*Miranda* warnings are "required only when a person has been deprived of his or her freedom in some significant way." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999). Agents "are not required to administer *Miranda* warnings to everyone whom they question." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). "'[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion . . . ." *Howes*

---

[5] Because the Court finds that the *Miranda* waiver is invalid, the Court finds it unnecessary to inquire into the voluntariness of subsequent statements.

*v. Fields*, 565 U.S. 499, 509 (2012). To determine whether a person is in custody, courts must examine "all of the circumstances surrounding the interrogation." *Id.* Factors to consider are enumerated above.

None of the officers told Williams that she was under arrest or that she was not free to leave, which weighs against a finding of custody. *United States v. Harder*, 180 F. Supp. 3d 355, 363 (E.D. Pa. 2016) (finding that defendant was not in custody where "[n]o one told [d]efendant that he was under arrest or that he was not free to leave"); *see also Reinert v. Larkins*, 379 F.3d 76, 86-7 (3d Cir. 2004) (finding defendant was not in custody even though "he was never told that he was free to leave or free not to answer questions"). That the encounter took place in Williams' residence also weighs against a finding of custody. The Third Circuit has found that "[w]hen a person is questioned *on his own turf* . . . the surroundings are not indicative of the type of inherently coercive settings that normally accompanies custodial interrogation." *Willaman*, 437 F.3d at 360 (quoting *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)). (emphasis in original).

The length of the interrogation similarly weighs against a finding of custody. The record shows that Williams was only subjected to one concrete instance of questioning when Agent Webber obtained Williams' consent to search. Otherwise, Williams did not endure any notable questioning. This brief encounter is insufficient for a finding of custody.

As to the fourth factor, Agent Webber testified that agents did not place Williams in restraints until after the search was concluded at around 10:30 a.m. Otherwise, Williams was free to roam about her residence. While it is true that agents carried weapons during the encounter this fact does not weigh in favor of a finding of custodial interrogation. The presence of armed and uniformed agents are characteristics of many searches and do not create a custodial interrogation per se. *United States v. Drayton*, 536 U.S. 194, 204-05, (2002). The Supreme Court has noted that officers are often required to wear uniforms and "that most law enforcement officers are armed is a fact well known to the public." *Id.* Therefore, that "the presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." *Id.*

Based on the totality of the circumstances, the Court concludes that Williams was not "in custody" prior to or during the search of her residence on March 21, 2021, and that Agent Webber was therefore not required to Mirandize her. Therefore, any statements Williams may have made during the search will not be suppressed. The Court also rejects defendant's argument that any subsequent *Miranda* waiver is inherently invalid due to the preceding un-Mirandized questioning.[6]

> 2. *Whether Williams' Waiver of her Miranda Rights at the HSI Facility were Made Knowingly, Intelligently, and Voluntarily*

Williams also seeks to suppress the statements made during her interrogation at the HSI facility after being taken into custody on the grounds that the *Miranda* waiver was otherwise not validly obtained. Accordingly, the Court must again apply the two-pronged inquiry to determine whether the March 22, 2021 waiver was knowingly, intelligently, and voluntarily made. First, the Court must determine whether the waiver "was the product of a free and deliberate choice rather than intimidation, coercion or deception." *United States v. Velasquez*, 885 F.2d 1076, 1084 (3d Cir. 1989). Second, the Court must inquire whether the waiver "was made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id. Miranda* rights are deemed waived "only where the totality of the circumstances 'reveal[s] both an uncoerced choice and the requisite level of comprehension.'" *Id.* (quoting *Moran*, 475 U.S. at 421).

Williams does not challenge the fact that she read the Miranda warnings or that she signed the form. The testimony of Agent Carter, which the Court finds credible, reveals that he advised Williams of her *Miranda* rights and that Williams did not ask any questions about those rights. Agent Carter also indicated that Williams appeared to understand her rights. Although the parties did not present evidence of Williams' education, Williams appears to be a reasonably intelligent individual, and the Court has no reason to believe otherwise.

---

[6] Williams cites to *Missouri v. Seibert* as her primary support for this argument. The Third Circuit applies a two pronged test to determine whether a *Miranda* waiver taken after un*Mirandized* questioning under *Seibert*: 1) whether the interrogator deliberately withheld *Miranda* warnings; and 2) whether curative measures were taken after the *Miranda* violation. *See United States v. Kiam*, 432 F.3d 524, 532 (3d Cir. 2006) (citing *Seibert*, 124 S.Ct. at 2616 (Kennedy, J., concurring)). Here, the Court has determined that officers were not required to *Mirandize* Williams during the search of her residence because there was no custodial interrogation. Therefore, there was no *Miranda* violation, deliberate or otherwise, and *Seibert* is inapplicable.

Furthermore, the record shows Williams had previously been advised of her *Miranda* rights just a few months prior during the December 8, 2020 encounter, and had therefore had experience with police interactions.

The record further reflects an absence of intimidation, coercion, or deception. Williams was not handcuffed at the time that she was read her rights, the agents did not display their firearms, and the agents did not make physical contact with Williams. There is no evidence of record reflecting any type of psychological intimidation utilized by the agents that led to Williams' waiver of her *Miranda* rights. In fact, the video recording of the interrogation shows a calm, conversational interview during which Williams showed no outward signs of stress.

Under the circumstances described above, the Court concludes that Williams effectuated a valid waiver of her *Miranda* rights. Agent Carter informed her of her rights while presenting her with the waiver, and the waiver "was made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Velasquez*, 885 F.2d at 1084.

### 3. Whether Williams' Statements Made at HSI Facility were Voluntarily

Having established that Williams knowingly, intelligently, and voluntarily waived her *Miranda* rights and that the waiver was not otherwise invalid, the Court now moves to address whether Williams' subsequent inculpatory statements were involuntarily obtained in violation of due process, notwithstanding a valid *Miranda* waiver. As discussed above, whether a suspect "voluntarily" waived his *Miranda* rights is distinct from the issue whether a confession was made "voluntarily" for purposes of due process concerns. *See Brown v. Cuyler*, 669 F.2d 155, 159 (3d Cir. 1982) ("Although there is a conceptual overlap between a claim that, under the totality of the circumstances, a confession was involuntarily made, and a claim that a confession was the product of an invalid waiver of the privilege against self-incrimination, we believe that the issues are distinct") (citing *Edwards v. Arizona*, 451 U.S. 477, 484 (1981)). Under this analysis, courts must similarly examine the totality of the circumstances to determine whether a confession has been "made freely, voluntarily and without compulsion or inducement of any sort." *Withrow v. Williams*, 507 U.S. 680, 689

(1993). Courts may consider circumstances such as the length of the interrogation, its location, and its continuity; as well as the defendant's maturity, education, physical condition, and mental health; and the failure of the police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation. *Id.* at 693-94. "In determining whether a confession was voluntary, we must satisfy ourselves that the confession was 'the product of an essentially free and unconstrained choice by its maker,' that it was 'the product of a rational intellect and a free will' and that the appellant's will was not 'overborne.'" *United States v. Swint*, 15 F.3d 286, 289 (quoting *United States ex rel. Hayward v. Johnson*, 508 F.2d 322, 326 (3d Cir. 1975).

The "flexible totality of the circumstances approach requires the reviewing court to consider the specific tactics utilized by the police in eliciting the admissions, the details of the interrogation, and the characteristics of the accused." *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986). As a threshold issue, to find a confession involuntary, the court must find that the confession was causally related to the misconduct of law enforcement personnel. *Connelly*, 479 U.S. at 164. Coercive tactics may include physical intimidation, psychological pressure, or the application of drugs or medication to induce a confession. *Townsend v. Sain*, 372 U.S. 293, 307 (1963).

The Court has previously established Williams is an adult of reasonable intelligence, at least, with previous experience with law enforcement. The Court does not doubt that she was fully capable of choosing to speak with agents, as she did. The interview itself was relatively brief, spanning a mere forty minutes, which weighs against a finding of involuntariness. Additionally, as established, Williams was informed of her *Miranda* rights prior to commencing the interview.

Furthermore, there are no indicia of coercion whatsoever, let alone coercion that could be causally related to Williams' statements. During the interview, Agent Carter did not brandish his weapon or make threatening statements. He is seen in a relaxed position and can be heard doing little more than asking questions to further the interview. Although any interaction with the police may induce stress, all evidence presented for the March 22, 2021 encounter indicate that it was a relatively calm and conversational process.

Based on the above, the Court finds that Williams' statements were voluntary. Therefore, because Williams was not required to be Mirandized prior to the search of her residence, because the *Miranda* waiver was properly obtained prior to her interrogation, and because her statements were voluntary, the Court will deny Williams' motion to suppress as to the March 22, 2021 statements.

### D. Whether the Court Should Suppress the Physical Evidence Seized on March 22, 2021

The Fourth Amendment guarantees all individuals the right to be free from unreasonable searches and seizures. *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990). A search warrant ordinarily is required for a valid search of private premises or property, and searches and seizures made without a warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). Notwithstanding, warrantless searches are constitutional where they are conducted pursuant to a valid consent. *United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011).

When consent is relied on to justify a search, the government must prove by a preponderance of the evidence that the consent was "freely and voluntarily given." *United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009). The government's burden "is not satisfied by showing a mere submission to a claim of lawful authority." *Price*, 558 F.3d 270, 278 (3d Cir. 2009) (quoting *Florida v. Royer*, 460 U.S. 491, 497(1983)) (internal quotations omitted). For consent to be voluntary, it cannot be the "product of duress or coercion, express of implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

The Third Circuit applies a "totality of the circumstances" test when determining whether consent was valid. *Stabile*, 633 F.3d at 231. An "appropriate inquiry into the voluntariness of a purported consent would include, without limitation: the age, education, and intelligence of the subject, whether the subject was advised of his or her constitutional rights, the length of the encounter, the repetition or duration of the questioning, and the use of physical punishment." *Oliva-Ramos v. Attorney General of U.S.*, 694 F.3d 259 (3d Cir. 2012) (citing U.S. Const. Amend. IV). Courts may also consider "the setting in which the consent was obtained and the parties' verbal and non-verbal actions." *United States v. Kellam*, 2015 U.S. Dist. LEXIS 146596, 2015 WL 6560637, at *6 (M.D. Pa. Oct. 29, 2015) (citing *United States*

*v. Givan*, 320 F.3d 452, 459 (3d Cir.2003)). However, "the Fourth Amendment does not require that the Government advise a suspect of his right to refuse consent before requesting such consent." *United States v. Himmelreich*, 2006 U.S. Dist. LEXIS 40092, 2006 WL 1722399, at *5 (M.D. Pa. June 16, 2006), *aff'd*, 265 F. App'x 100 (3d Cir. 2008).

Williams contends that the consent was invalid due to the coercive techniques used by Agent Webber, namely, that he misrepresented the scope of the search when seeking the consent. Williams contends that she consented to a search for packages, and that agents exceeded the scope of her consent when they seized the firearms and firearm parts. The Court disagrees.

The Government has the burden of demonstrating both the scope and the voluntariness of the consent by a preponderance of the evidence. *See Bumper v. North Carolina,* 391 U.S. 543, 548 (1968). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 183-189 (1990)). A defendant may impose limits upon the scope of search to which she consents. *See id.* at 252. However, "if [her] consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization." *Id.* The issue here is whether Williams' consent was limited the scope of the search to packages only. For the following reasons, it does not.

Williams provided the agents with a written and signed consent form indicating that the scope of the search was the "residence" without further qualification. While it is true that Agent Webber testified that he informed Williams of his intent to search for additional packages, he did not specify that he would only search for such items, as indicated through the consent. In fact, it was clear from the conversation between Williams and Agent Webber prior to the consent that Agent Webber sought to search the residence for the gun parts that could be contained within the packages. The Court does not construe this language as restrictive and believes that it was not reasonable for Williams to interpret it as such.

To the contrary, it is objectively reasonable for Williams to have expected officers to search any part of her house in which gun parts and packages containing gun parts could be stored and to seize any such items. Agents searched Williams' residence, and in the process discovered and seized multiple guns and gun parts. Because the items were in the residence listed on the consent form and were precisely the items that were the subject of the consent, the evidence was within the scope of consent. Williams' failure to object to the search while it took place further weakens her argument. *See United States v. Watkins*, 760 F.3d 1271, 1283 (11th Cir. 2014) (holding that although officer obtained defendant's consent through promises to limit the scope of the search, the defendant's failure to object when wife gave unlimited consent nullified the limitations on the search); *see also United States v. Baer,* 843 F. App'x 472, 476 (3d Cir. 2021) (denying a motion to suppress where the defendant consented to a full search of his residence without limitation and never sought to revoke his consent or to have the devices returned).

Examining the remaining factors enumerated above, the Court finds that the totality of the evidence indicates that the consent was valid. There is nothing in the record to suggest that Williams' age, intelligence, or education would contribute to an inability to comprehend and consent to police activity. Further, Williams' consent was obtained in front of her residence, and Agent Webber testified that the conversation was quiet and calm and lasted for only a few minutes. Williams was not subject to prolonged questioning. During the search, Williams was not handcuffed or restrained. She did not object to the search at any point while it was being conducted. Agent Webber did not testify whether he informed Williams of her right to refuse the search, which could weigh against a finding of valid consent, but as noted, this is not dispositive.

The Court finds that Williams knowingly and intelligently consented to the search. The Court further finds that there were no indicia of coercion here, as a reasonable person would have interpreted the consent document to have been unrestrictive, and the conversation leading up to the signing of the consent and the context of the search would have elicited similar conclusions. Furthermore, even if there were restrictions, Williams' failure to object severely weakened her claim of non-consent. Therefore, the Court finds that

Williams consent to the search of her residence was valid and will deny Williams' motion to suppress.

### III. CONCLUSION

For the reasons outlined above, the Court finds that the Government has failed to meet its burden to show that the *Miranda* waiver and subsequent statements taken on December 8, 2020, were voluntary and therefore will grant the motion to suppress as to these statements. Further, the Court finds that the *Miranda* waiver and subsequent statements on March 22, 2021, were knowing, intelligent and voluntary, and therefore will deny the motion to suppress as to the March 22, 2021 statements. Finally, the Court finds that Williams' consent to search her residence on March 22, 2021, was knowing, voluntary, and intelligent, and therefore will deny the motion to suppress physical evidence.

An appropriate Order follows.

**Dated:** June 23, 2023                              */s/ Robert A. Molloy*
                                                      **ROBERT A. MOLLOY**
                                                      **Chief Judge**